**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.**

PLITEQ HOLDINGS INC.,
a Canadian corporation, and
PLITEQ, INC.,
a Canadian corporation,

Plaintiffs,

v.

REGUPOL AMERICA, LLC,
a Pennsylvania Limited Liability Company,
JOHN FRIEDKES, an individual, and
MICHAEL BERGMAN, an individual
Defendants.
__________________________________/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs Pliteq Holdings, Inc. and Pliteq, Inc., through undersigned counsel, hereby sues Defendants REGUPOL AMERICA, LLC, JOHN FRIEDKES, and MICHAEL BERGMAN, and alleges as follows:

**Parties, Jurisdiction, and Venue**

1. Plaintiff Pliteq Holdings Inc. is a corporation organized under the laws of the Province of Ontario, Canada, with its principal place of business in Toronto, Ontario, Canada.

2. Plaintiff Pliteq, Inc. is a corporation organized under the laws of the Province of Ontario, Canada, with its principal place of business in Toronto, Ontario, Canada.

3. Defendant Regupol America, LLC ("Regupol"), is a limited liability company organized under the laws of Delaware, with its principal place of business in Lebanon, Pennsylvania.

4. Defendant Michael Bergman ("Bergman") is an individual residing in Closter, New Jersey. He is domiciled in and a citizen of New Jersey.

5. Defendant John Friedkes ("Friedkes") is an individual residing in Broward County, Florida. He is domiciled in and a citizen of Florida.

6. Plaintiffs have been forced to bring this action seeking injunctive and other relief to protect their highly proprietary, confidential and trade secret information. Bergman and Friedkes were shareholders of and former sales agents for Pliteq, who have breached their contractual obligations and violated federal trade secret law by, among other misconduct, using Pliteq's Information to solicit Pliteq's clients on behalf of Pliteq's competitor, Defendant Regupol. Plaintiff seeks injunctive relief to protect the Information and ensure that its business is not further irreparably harmed by the unauthorized competition and use of its information by its competitor. Plaintiff also seeks damages, including consequential and punitive damages, suffered as a result of Defendants' concerted misconduct.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and the principles of supplemental jurisdiction pursuant to U.S.C. § 1367. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

8. This Court has personal jurisdiction over Defendants who, individually and together, acting in concert, have committed, and threatened to commit, tortious acts or omissions within this State; have committed, and threatened to commit, tortious injury in this State caused by an act or omission outside this State and regularly do or solicit business, or engage in other persistent courses of conduct, or derive substantial revenue from goods, purchased, used or consumed or services rendered in this State.



COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

9. More specifically, this Court has personal jurisdiction over non-residents Regupol and Bergman because they committed tortious acts and conspired with Friedkes within Florida by tortiously interfering with Pliteq's business relationships in South Florida, thereby causing harm to Pliteq in Florida. These actions include Friedkes's use of trade secret information misappropriated by Bergman to interfere with Pliteq's contracts and business relationships in Miami, in concert with Bergman on Regupol's behalf and for Regupol's benefit.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2)-(3).

**PLITEQ'S BUSINESS AND TRADE SECRETS**

11. Pliteq, Inc., a wholly-owned subsidiary of Pliteq Holdings, Inc., is a successful engineering services and manufacturing firm, employing more than 280 people, and operating its own state-of-the-art manufacturing facility for recycled rubber products in Toronto, Canada; Milwaukee, Wisconsin; and Surprise, Arizona. For ease of reference, Plaintiffs Pliteq Holdings, Inc. and Pliteq, Inc. will be identified as "Plaintiffs" or "Pliteq."

12. Pliteq is widely recognized as an industry leader in the highly competitive market of sound reduction technology. It manufactures and sells a line of proprietary sound reduction products under the "GenieMat" brand, which are used to reduce sound transmission in residential, high-rise buildings throughout the world.

13. Among Pliteq's 280 employees are more than 75 engineers and business development team members operating throughout major metropolitan areas in Canada and the in the United States.

14. Approximately 65% of Pliteq's annual revenues derive from projects in the United States, including projects in the South Florida area.

15. Indeed, Pliteq's success in establishing a market for its products and services in South Florida's highly competitive construction industry has made it a litigation target for competing manufacturers and distributors of competing products. *See, e.g., Marjam Supply Co. of Fla, LLC v. Pliteq Inc., et al.*, Case No. 15-24363-CIV (S.D. Fla. 2015); *Pliteq, Inc. v. Ecore Int'l, Inc., et al*, Case No. 19-cv-24095 (S.D. Fla. 2019).

16. As well, Pliteq's primary competitors also operate internationally, with substantial operations based in the United States and directed to Florida. Regupol, like Pliteq, designs, manufactures, and distributes sound reduction technology, and markets its products throughout the United States and in South Florida. Regupol is one of Pliteq's main competitors in the North American market.

17. The success of Pliteq's products results, in large part, from the extensive engineering, research, and development behind its products and manufacturing processes. With new inventions under development at all times, and multiple patents already registered in the United States and worldwide, Pliteq's engineers have completed thousands of laboratory tests, with rigorous testing continuing on a monthly basis.

18. Pliteq's research and development, design documents, formulas, manufacturing and facility plans and operations, and testing data are highly confidential and proprietary, extremely valuable and important to its business and reputation. This critical information includes Pliteq's customer data, including price lists, customer lists and contacts, marketing information and target project data. (Collectively, "Information").



COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

**BERGMAN'S AND FRIEDKES' CONTRACTUAL OBLIGATIONS**

19. Bergman and Friedkes are former Pliteq sales agents. Their relationships with Pliteq were governed by a series of independent sales agent agreements ("ISAs"), which were renewed on a periodic basis.

20. In addition to working for many years as Pliteq sales agents, Bergman and Friedkes were also Pliteq shareholders. On May 29, 2018, they both signed a Shareholder Agreement ("2018 Agreement") providing that:

> Any matters, financial or otherwise, with respect to the Corporations, their respective subsidiaries or Affiliates, including without limitation the terms of this Agreement, which is not divulged by the Corporations to the public in the ordinary course of its business shall be deemed to be confidential and any Shareholder who wishes to divulge such confidential information to any third party shall, as a condition to such divulging, obtain the prior approval of the Board.

21. On January 29, 2021, Bergman and Friedkes signed Amendment No. 1 to the 2018 Agreement ("First Amendment"). In relevant part, Amendment No. 1 provided that the 2018 Agreement "shall not be amended, altered, or qualified except by an instrument in writing signed by sixty-seven percent (67%) of the Voting Shareholders."

22. On March 21, 2021, the 2018 Agreement, as amended, was amended by Pliteq's Second Amended and Restated Shareholders' Agreement ("Shareholders' Agreement") (attached as Exhibit "A" hereto),[1] dated March 1, 2021, specifically identified Pliteq, Inc. as a wholly-owned subsidiary of Pliteq Holdings, Inc. Ex. A, Recitals 4-8. It further provided as follows:

[1] Aside from Article 10, no other provisions of the Shareholders' Agreement (or 2018 Agreement) are relevant to this dispute. The remaining provisions contain non-public, sensitive, and confidential information relating to the operation and governance of Pliteq Holdings, Inc. and Pliteq, Inc, as well as information relating to their investors and principals. Accordingly, a redacted version of the Shareholders' Agreement is being filed pursuant to Local Rule 5.4(f).

**ARTICLE 10**

**CONFIDENTIALITY, NON-SOLICATION AND NON-COMPETITION**

> (a) each Employee Shareholder and its principal agrees that he, she or it shall not, without the prior written consent of the Corporation, directly or indirectly communicate or disclose to any Person, or use for any purpose other than in furtherance of the Corporation's Business (or the Shareholder's own internal and non-competitive business purposes, and then only to his, her or its advisors), any knowledge or information acquired by such Shareholder or its principal, if any, relating to or concerning the technology, trade secrets, systems or any other confidential information regarding the property, business or affairs of the Corporation or any Subsidiaries ("Information"), nor shall it utilize or make available any such knowledge or information, directly or indirectly, in connection with the transfer or proposed transfer of any of his, her or its Shares (except as permitted pursuant to paragraph (b) of this Section) or in connection with the solicitation or acceptance of employment with any competitor of the Corporation or its Subsidiaries. Each Shareholder and its principal, if any, agrees to deliver to the Corporation all documents and other media containing any confidential or proprietary Information of the Corporation without retaining any copies thereof upon ceasing to be a Shareholder or principal of a Shareholder of the Corporation. For greater certainty, the foregoing obligations are in addition to any other confidentiality obligations under any other agreement.

Art. 10, p. 24. The provision further confirmed the parties' acknowledgment that disclosure of Pliteq's Information would constitute irreparable harm, warranting injunctive relief:

(d) each Employee Shareholder and its principal agrees and acknowledges that disclosure of any confidential Information regarding the Corporation or its Subsidiaries in contravention of this Section may cause significant harm to the Corporation or its Subsidiaries, as applicable, and that remedies at law may be inadequate to protect against a breach of this Section. Accordingly, each party agrees that the Corporation and its Subsidiaries shall be entitled, in addition to any other relief available to it, to the granting of injunctive relief without proof of actual damages or the requirement to establish the inadequacy of any of the other remedies available to it. Each party covenants not to assert any defense in proceedings regarding the granting of an injunction or

specific performance based on the availability to the Corporation or the Subsidiary of any other remedy.

*Id.* at 24-25.

23. As well, the Shareholders' Agreement confirmed the obligations of Bergman and Friedkes, as Employee Shareholders, not to compete with Pliteq or solicit its customers:

> (e) each Employee Shareholder and its principal agrees that he, she or it shall not, without the prior written consent of the Corporation, hire or take away or cause to be hired or taken away any employee of the Corporation or the Subsidiaries; and it will not solicit any current customer or any potential customer of the Corporation or the Subsidiaries.
>
> (f) each Employee Shareholder and its principal agrees that he, she or it shall not, while a Shareholder and for two (2) years after he, she or it ceases to be a Shareholder, directly or indirectly, carry on any business activity competitive with the Business in Canada or the United States. If the Corporation or the Subsidiaries carry on (or enter into detailed two-way negotiations with respect to carrying on) the Business in any other country, this restriction shall apply to that country as well.

*Id.* at 25.

24. The Shareholders' Agreement was signed by shareholders representing 67% or more of the voting shares. Ex. A at pp. 31-34.

25. Friedkes's shares were purchased by Pliteq on August 2, 2023. Accordingly, he was bound by Article 10's restrictive covenants for a two year period beginning on August 2, 2023. Bergman remains a shareholder.

26. During their time with Pliteq as sales agents and shareholders, Bergman and Friedkes had access to Pliteq's proprietary customer information database, called Netsuite, which is password-protected and contains non-public Information about Pliteq's projects, its marketing targets and prospective business opportunities.

27. They also had access to EchoOne, Pliteq's proprietary, password-protected database containing testing reports for Pliteq products. That database consists of thousands of



COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

proprietary reports from the continual testing Pliteq performs of its products in different installations and designs. The reports are selectively used to demonstrate to industry representatives and consultants the superior performance of Pliteq's products compared to those of competitors, as a basis for specifying Pliteq on pending projects.

28. In late November 2024, Pliteq informed Bergman and Friedkes that it intended to re-negotiate the terms of the existing ISAs to reflect ongoing market and business conditions, as is its periodic practice, before the ISAs terminated on January 25, 2025.

29. Pliteq then sent new, proposed agreements to them, and continued discussions on the renewal over the next several weeks.

30. Unbeknownst to Pliteq, however, Bergman and Friedkes had no intention of entering into new ISAs. Instead, Bergman and Friedkes surreptitiously planned to become sales representatives for Regupol – Pliteq's direct competitor – even as they were purporting to negotiate new ISAs with Pliteq, and in violation of their non-competition and non-solicitation obligations to Pliteq.

31. In the meantime, though, without any indication of their secret plan to work with Regupol, both Bergman and Friedkes used the negotiations with Pliteq as a pretext to ensure their continued access to Pliteq's Information.

32. Throughout December of 2024 and early January of 2025, Freidkes continued to communicate with Pliteq about potential new projects in Florida, requesting product and customer information that Pliteq provided.

33. Then, without prior notice, he abruptly resigned from Pliteq on January 17, 2025, still with no mention that he had accepted a new position with Regupol.

34. Bergman, in turn, had several communications with Pliteq representatives in December and early January 2025, about the renewed agreement, also with no indication whatsoever that he was planning to work with Regupol.

35. In fact, on or about January 23, 2025, Bergman asked for a current Pliteq product price list, in order to calculate potential commissions based on the rates proposed in the new ISA.

36. Pliteq provided the list, which contained additional non-public, sensitive information that derives independent value from being unknown to others who could profit from its disclosure or use.

37. Bergman, though, did not respond further, prior to the termination of the existing ISA on January 25, 2025.

**PLITEQ DISCOVERS THE MISCONDUCT**

38. Shortly thereafter, however, Pliteq discovered what had occurred.

39. Pliteq was notified by several current customers located throughout South Florida and elsewhere in the United States that they had been contacted by Bergman and Friedkes, who were holding themselves out as Regupol sales representatives.

40. Pliteq's IT department also conducted a forensic audit of Bergman's recent activity on EchoOne, Pliteq's proprietary database of test results.

41. The audit confirmed that Bergman, who did not download a single test report from EchoOne between November 2024 and January 9, 2025, downloaded more than a dozen test reports from EchoOne between January 9, 2025, and January 23, 2025.

42. Then, on January 28, 2025 - three days after his ISA expired - Bergman surreptitiously logged into Echo One and downloaded confidential Information, including four product testing reports.

43. Concerningly, the information downloaded by Bergman correlates to products which are in direct competition with products manufactured and sold by Regupol, the details of which are as follows:

| Date and Time | Material Downloaded | Content / Relationship to Regupol |
|---|---|---|
| Jan 28, 2025, 8:57 a.m | FC21-0352R1 re: GenieMat DH760 Flooring | The most prevalent product in New York City construction and a proprietary formula created by Pliteq designed to out-perform Regupol 10mm flooring. |
| Jan 28, 2025, 8:58 a.m | FC21-0354R1 re: GenieMat DH755 Flooring | A proprietary formula belonging to the Pliteq that is designed to out-perform Regupol 3mm flooring. |
| Jan 28, 2025, 9:00 a.m. | A1-008867-00F re: GenieMat FIT30 Flooring<br><br>A1-008867-00F re: GenieMat FIT70 Flooring | The baseline data that was used to build Pliteq's GenieMat FIT products and business. A new Regupol product, Regupol Active Pro, is being marketed to compete with GenieMat FIT. |

44. Using the Information they had obtained through their relationships with Pliteq, including these reports and the price list, and in violation of their restrictive covenants, Bergman and Friedkes contacted at least 6 Pliteq customers in Miami and 7 Pliteq customers in New York City who had orders in progress.

45. Bergman and Friedkes, acting in conjunction with each other and with Regupol, used Pliteq's price list and testing reports to undercut Pliteq, offering below-market rates on Regupol sound reduction products as substitutes for the Pliteq products that had been ordered by Pliteq's customers on these projects.



COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

46. The Defendants had full knowledge of and interfered with Pliteq's business relationships with Miami-based customers J&P Tiles; ET Flooring Contractors, FBD Contracting Group, Seawood Builders, B&B Contracting, and JoDis Quality Surfaces, as well as other U.S. customers including Pyramid Floor Covering, Resource Flooring, Shehadi Commercial Flooring, TF Andrews, J&R Services, City Interiors, and Urban Flooring Systems (together, "Customers") through Friedkes and Bergman's prior relationships with Pliteq.

47. In addition, Bergman and Friedkes falsely reported to Pliteq's customers that Pliteq was being sold, and also misrepresented the circumstances of their departure from Pliteq.

48. As the Defendants intended, certain of Pliteq's customers contacted Pliteq, threatening to cancel their orders if Pliteq did not meet or beat the artificially low pricing Regupol offered through Bergman and Friedkes, using the confidential price list Bergman obtained from Pliteq under the pretext of negotiating a new ISA.

49. To maintain their customer relationships, Pliteq was forced to meet or beat the artificially low pricing, resulting in hundreds of thousands of dollars in losses to Pliteq.

50. In other instances, as a result of Bergman and Freidkes's interference, in concert with Regupol, Pliteq has lost business entirely.

51. Bergman, Friedkes, and Regupol did not cooperate with Pliteq's demands to return the Information and ensure that it could no longer be used or disclosed by Bergman and Friedkes on Regupol's behalf.

52. Regupol as well has failed and refused to cooperate and has continued to conceal its relationship with Bergman and Friedkes.

53. On information and belief, Regupol has also acted in concert with other former Pliteq employees, including a former Pliteq officer, Maged Mostafa, in seeking to interfere with Pliteq and its business.

54. Pliteq has been forced to expend significant resources to address the Defendants' misconduct and has otherwise suffered harm as a direct and proximate result.

55. The irreparable harm to Pliteq, its business, reputation and good will, will continue, absent entry of injunctive relief.

56. All conditions precedent to the bringing of this action have been satisfied, performed, excused, waived or would be futile.

57. Pliteq has been obligated to retain undersigned counsel and are obligated to pay their reasonable attorney's fees.

**COUNT I**

**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (Against All Defendants)**

58. Pliteq incorporates the allegations in Paragraphs 1 through 57 above, as if set forth herein.

59. This is an action for misappropriation of trade secrets pursuant to 18 U.S.C. § 1836, et. seq.

60. Under 18 U.S.C. § 1836(b), the owner of a misappropriated trade secret may bring a civil action if the trade secret relates to a product or service used in, or intended for use in, interstate or foreign commerce.

61. 18 U.S.C. § 1836(b)(3) authorizes a wide range of remedies for misappropriation, including (a) an injunction to prevent actual or threatened misappropriation; (b) an award of

damages; (c) an award of exemplary damages if the trade secret was willfully and maliciously appropriated; and (d) an award of attorney's fees if the trade secret was willfully and maliciously appropriated.

62. The Information accessed, used, and disclosed by Bergman and Friedkes on Regupol's behalf without authorization included trade secrets owned by Pliteq. The trade secrets include:

(a) financial documents, including but not limited to Pliteq's price lists;

(b) proprietary marketing documents, such as customer lists, project lists, consultant lists, industry contact lists, marketing analyses, and business plans; and

(c) technical information, such as proprietary third-party testing reports, product plans, product design documents, product formulas, production capacity information, and manufacturing processes.

63. The Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use. This includes, but is not limited to Pliteq's competitors in the US market, including Regupol.

64. Pliteq took reasonable measures to preserve the Information, and to prevent its disclosure to third parties.

65. The information is related to products and services used, and intended to be used, in interstate and foreign commerce.

66. The Defendants misappropriated Pliteq's Information by improper means; without any legitimate business purpose; with the knowledge that the Information was acquired under

circumstances giving rise to a duty to maintain their secrecy and/or limit their use; and for Defendants improper benefit, to the Plaintiff's detriment.

67. The Defendants have, individually and collectively, failed and refused to return the Information to Pliteq, to certify its destruction or confirm it would not be disclosed without Pliteq's authorization. Instead, they have disseminated and used it for improper purposes.

68. The Defendants' conduct has proximately caused damage to Plaintiff.

69. The misconduct continues to threaten further irreparable harm for which there is no adequate remedy at law.

70. As well, the Defendants' misconduct, if not promptly stopped and enjoined, will result in further irreparable harm to Plaintiff, for which there is no adequate remedy at law.

WHEREFORE, Pliteq demands entry of judgment against the Defendants, jointly and severally, for preliminary and permanent injunctive relief enjoining the Defendants from possessing, using or disclosing Pliteq's Information (including but not limited to injunctive relief in the form of independent verification that none of Pliteq's Information remains in the Defendants' possession, custody, or control, or the possession, custody, or control of any entity with which they are affiliated); monetary damages, disgorgement, and the return of Pliteq's Information; damages addressing the consequences of the Defendants' misconduct, including but not limited to any lost profits, business loss or interruption, and damage to reputation and goodwill suffered by Pliteq; exemplary damages; punitive damages; and an award of attorney's fees, interest, and costs; along with any and all further relief the Court deems proper.

## COUNT II

## UNFAIR COMPETITION
## (Against All Defendants)

71. Pliteq incorporates the allegations in Paragraphs 1 through 57 above, as if set forth herein.

72. This is an action for unfair competition.

73. The Defendants have acted in concert to improperly access and download Pliteq's confidential, proprietary and trade secret Information, through misrepresentations and false pretenses. The Information includes Pliteq's price lists; customer lists; project lists; consultant lists; price lists; industry contact lists; and technical information, such as proprietary third-party testing reports.

74. The Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. This includes, but is not limited to Pliteq's competitors in the US market, such as Regupol.

75. Pliteq took reasonable measures to preserve the Information, and not disclose it to third parties.

76. The Information is related to products and services used, and intended to be used, in interstate and foreign commerce.

77. The Defendants misappropriated Pliteq's Information by improper means; without any legitimate business purpose; with the knowledge that the Information was acquired under circumstances giving rise to a duty to maintain its secrecy and/or limit its use; and for Defendants' improper benefit, to Pliteq's detriment.

78. The Defendants have, individually and collectively, failed and refused to return the information to Pliteq, to certify its destruction or confirm it would not be disclosed without Pliteq's authorization. Instead, they have disseminated and used it for improper purposes.

79. The Defendants' conduct has proximately caused damage to Pliteq.

80. As well, the Defendants' misconduct, if not promptly stopped and enjoined, will result in further irreparable harm to Pliteq, for which there is no adequate remedy at law.

81. The Defendants' conduct constitutes unfair competition, and is not permitted.

WHEREFORE, Pliteq demands entry of judgment against the Defendants, jointly and severally, for preliminary and permanent injunctive relief enjoining the Defendants from possessing, using or disclosing Pliteq's Information (including but not limited to injunctive relief in the form of independent verification that none of Pliteq's Information remains in the Defendants' possession, custody, or control, or the possession, custody, or control of any entity with which they are affiliated); monetary damages, disgorgement, and the return of Pliteq's Information; damages, including but not limited to consequential damages, any lost profits, business loss or interruption, and damage to reputation and goodwill; punitive damages; and an award of attorney's fees, interest, and costs; along with any and all further relief the Court deems proper.

## COUNT III

## INJUNCTIVE RELIEF
## (Against All Defendants)

82. Pliteq repeats and re-alleges Paragraphs 1 through 57 above, as if set forth fully herein.

83. This is an action for injunctive relief.



COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

84. As alleged herein, the Information misappropriated by Defendants is invaluable to any number of Pliteq's competitors, including Regupol.

85. Pliteq will suffer irreparable injury if Defendants continue to use and disclose the information, for which Pliteq has no adequate remedy at law.

86. If not enjoined, the Defendants will continue to improperly benefit, including by directly or indirectly publishing, disclosing, or using Pliteq's Information for their own gain.

87. Pliteq seeks an injunction preventing the Defendants from transferring, using, or disclosing any information belonging to Pliteq for any Defendant's benefit or the benefit of any competitor of Pliteq.

88. Pliteq further seeks an injunction requiring the Defendants to return to Plaintiffs any information remaining in their possession, custody, or control.

89. The misconduct continues to threaten further irreparable harm for which there is no adequate remedy at law.

WHEREFORE, Pliteq demands entry of judgment against the Defendants, jointly and severally, for preliminary and permanent injunctive relief enjoining the Defendants from possessing, using or disclosing Pliteq's Information (including but not limited to injunctive relief in the form of independent verification that none of Pliteq's Information remains in any Defendant's possession, custody, or control, or the possession, custody, or control of any entity with which they are affiliated); enforcing the non-competition provisions of Article 10 of the Shareholders' Agreement, including an extension of the two-year period based on Defendant Friedkes's breach; and an award of attorney's fees, interest, and costs; along with any and all further relief the Court deems proper.


COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

## COUNT IV

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
## (Against All Defendants)

90. Pliteq repeats and re-alleges Paragraphs 1 through 57 as if set forth fully herein.

91. The misconduct continues to threaten further irreparable harm for which there is no adequate remedy at law.

92. This is an action for tortious interference with business relationships.

93. Regupol and Bergman had full knowledge of Pliteq's business relationships with Pyramid Floor Covering, Resource Flooring, Shehadi Commercial Flooring, TF Andrews, J&R Services, City Interiors, and Urban Flooring Systems through and Bergman prior relationships with Pliteq.

94. Regupol and Bergman interfered with Pliteq's business relationships with these Customers.

95. Specifically, Bergman and Regupol obtained Pliteq's Information through misrepresentations and under false pretenses, then used it to convince Pliteq's Customers to cancel existing orders or cease doing business with Pliteq.

96. Similarly, Regupol and Friedkes had full knowledge of Pliteq's business relationships with Miami-based Customers J&P Tiles, ET Flooring Contractors, FBD Contracting Group, Seawood Builders, B&B Contracting, and JoDis Quality Surfaces through Friedkes's prior relationship with Pliteq.

97. Regupol and Friedkes interfered with Pliteq's business relationships with these Customers.

98. As one example, Regupol, through Friedkes, used the price list and test reports improperly obtained by Bergman to provide generate its own purportedly favorable test report and



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

artificially low prices on competitive Regupol products to Seawood Builders, a Pliteq Customer located in Miami.

99. Defendants' interference was intentional and unjustified, implemented with a deliberate and improper motive to damage Pliteq's reputation economic position while usurping its role as a supplier to the customers.

100. The interference was not privileged.

101. As a direct and proximate result, Pliteq has been damaged.

WHEREFORE, Pliteq demands entry of judgment against the Defendants, jointly and severally, for damages including but not limited to consequential damages, any lost profits, business loss or interruption, damage to reputation and goodwill, and punitive damages plus interest, costs, and such further relief as the Court deems just and proper.

**COUNT V**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
**(Against Regupol)**

102. Pliteq incorporates Paragraphs 1 through 57 above, as if fully set forth herein.

103. This is an action for tortious interference with contract.

104. Regupol had full knowledge of Bergman and Friedkes's confidentiality and non-competition obligations with Pliteq.

105. Regupol intentionally interfered with Pliteq's agreements by inducing Bergman and Friedkes to breach their confidentiality and non-competition obligations.

106. This interference was neither privileged nor justified.

107. As a direct and proximate result of Regupol's unjustified and intentional interference, Pliteq has been damaged.

WHEREFORE, Pliteq demands entry of judgment against Regupol for damages including but not limited to consequential damages, any lost profits, business loss or interruption, damage to reputation and goodwill, and punitive damages plus interest, costs, and such further relief as the Court deems just and proper.

**COUNT VI**

**CONSPIRACY**
**(Against All Defendants)**

108. Pliteq repeats and re-allege Paragraphs 1 through 57 above, as if set forth fully herein.

109. This is an action for civil conspiracy.

110. The Defendants unlawfully conspired to intentionally convert Pliteq's Information to their own economic benefit, by knowingly and without authorization appropriating, taking, carrying away, or concealing, or by fraud, artifice, or deception obtaining Pliteq's Information; by copying duplicating, downloading, uploading, replicating, transmitting, delivering, sending, emailing, or communicating Pliteq's Information; receiving, buying, or possessing Pliteq's Information, knowing the same to have been stolen, appropriated, obtained, or converted without authorization, in violation of 18 U.S.C. § 1832(a)(5).

111. In furtherance of the conspiracy, Bergman and Friedkes obtained Pliteq's Information through misrepresentations and false pretenses. Regupol used the improperly obtained Information to generate favorable test reports and offer artificially low pricing to Pliteq's Customers in Miami and elsewhere in the United States through Bergman and Friedkes, in an effort to usurp Pliteq's role as a supplier while causing Pliteq economic and reputational damage.

112. As one example, Regupol, through Friedkes, used the price list and test reports improperly obtained by Bergman by fraud, artifice, or deception to provide a favorable test report

and artificially low prices on competitive Regupol products to Seawood Builders, a Pliteq Customer located in Miami.

113. Defendants exercised their combined power acquired as a result of their conspiracy to undermine Pliteq's ability to fairly compete and cause Pliteq harm.

114. As a direct and proximate result of the conspiracy, Pliteq suffered harm.

WHEREFORE, Pliteq demands judgment against all Defendants, jointly and severally, for damages including but not limited to consequential damages, any lost profits, business loss or interruption, damage to reputation and goodwill, and punitive damages plus interest, costs, and such further relief as the Court deems just and proper.

**COUNT VII**

**UNFAIR BUSINESS PRACTICES**
**(Against All Defendants)**

115. Pliteq incorporates Paragraphs 1 through 56 above, as if set forth fully herein.

116. This is an action for damages and injunctive relief for violation of the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201 to 501.213, Fla. Stat. ("FDUTPA").

117. Defendants engaged in unfair competition, misappropriation of trade secrets, and tortious interference with business relationships.

118. Among other misconduct, Defendants improperly accessed and used Pliteq's confidential and proprietary product test reports to re-issue test reports for directly competitive Regupol products, to make it appear to consumers that Regupol's products were superior to Pliteq's.

119. The conduct alleged constitutes unfair and deceptive acts or practices.

120. Defendants acted wrongfully by misappropriating Plaintiff's information and using that information to undercut and destroy Pliteq's relationships with its Customers.



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

121. Defendants engaged in acts or trade or commerce by using the information they misappropriated from Pliteq to usurp Pliteq's role as a supplier of goods and services to Pliteq's customers in Miami and elsewhere in the United States.

122. Defendants knowingly, intentionally, recklessly, and/or grossly negligently acted to injure Pliteq.

123. As a direct and proximate result of Defendants' misconduct, Pliteq has suffered injury.

124. Unless temporarily and permanently enjoined, Defendants will continue their unlawful conduct and cause Pliteq to suffer additional financial and reputational harm, including loss of goodwill, which is irreparable. Pliteq does not have an adequate remedy at law, and money damages are inadequate to redress the injuries that Defendants' misconduct has caused and will continue to cause.

WHEREFORE, Pliteq demands judgment against Defendants, jointly and severally, for damages and injunctive relief, pre- and post-judgment interest, temporary and permanent injunctive relief, and any such other and further relief that the Court deems appropriate.

**COUNT VIII**

**BREACH OF CONTRACT**
**(Against Bergman)**

125. Pliteq incorporates Paragraphs 1 through 57 above, as if fully set forth herein.

126. This is an action for breach of contract.

127. The Shareholders' Agreement is an enforceable contract between Pliteq and Bergman.

128. Bergman is bound by the terms of the restrictive covenants contained in Article 10 of the Shareholders' Agreement.

129. The restrictive covenants contained in Article 10 of the Shareholder Agreement are supported by legitimate business interests.

130. The restrictive covenants contained in Article 10 of the Shareholders' Agreement are reasonable in their duration and scope and the imposition of injunctive relief against Bergman will not disserve public policy.

131. Further, Bergman expressly acknowledged, agreed, and consented in the Shareholders' Agreement to the propriety of injunctive relief. Injunctive relief is warranted as there is not an adequate remedy at law.

132. As set forth above, Bergman breached Article 10 of the Shareholders' Agreement by, *inter alia*, disclosing Pliteq's Information to Regupol, and engaging in direct competition with Pliteq in the United States.

133. As a direct and proximate result of Bergman's breaches, Pliteq has been damaged.

WHEREFORE, Pliteq demands entry of judgment against Bergman for damages, including consequential damages, lost profits, business loss or interruption, damage to reputation and goodwill; temporary and permanent relief enforcing and extending the provisions of the Shareholder Agreement, prejudgment interest, costs, attorney's fees pursuant to Section 542.335, Florida Statute, and any other and further relief the Court deems appropriate.

## COUNT IX

## BREACH OF CONTRACT
## (Against Friedkes)

134. Pliteq incorporates Paragraphs 1 through 56 above, as if fully set forth herein.

135. This is an action for breach of contract.

136. The Shareholders' Agreement is an enforceable contract between Pliteq and Friedkes.

137. Friedkes is bound by the terms of the restrictive covenants contained in Article 10 of the Shareholders' Agreement.

138. The restrictive covenants contained in Article 10 of the Shareholders' Agreement are supported by legitimate business interests.

139. The restrictive covenants contained in Article 10 of the Shareholders' Agreement are reasonable in their duration and scope and the imposition of injunctive relief against Bergman will not disserve public policy.

140. Further, Friedkes expressly acknowledged, agreed, and consented in the Shareholders' Agreement to the propriety of injunctive relief. Injunctive relief is warranted as there is not an adequate remedy at law.

141. As set forth above, Friedkes breached Article 10 of the Shareholders' Agreement by, *inter alia*, disclosing Pliteq's Information to Regupol, and engaging in direct competition with Pliteq.

142. As a direct and proximate result of Friedkes's breaches, Pliteq has been damaged.

WHEREFORE, Pliteq demands entry of judgment against Freidkes for damages, including consequential damages, lost profits, business loss or interruption, damage to reputation and goodwill; temporary and permanent relief enforcing and extending the provisions of the Shareholders' Agreement for an additional two (2) years, prejudgment interest, costs, attorney's fees pursuant to Section 542.335, Florida Statutes, and any other and further relief the Court deems appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues and claims so triable.

Dated: July 9, 2025. Respectfully submitted,



COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

**COFFEY BURLINGTON, P.L.**
*Counsel for Plaintiffs*
2601 South Bayshore Drive, Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261

By: /s/ *Kevin C. Kaplan*
Kevin C. Kaplan, Esq.
Florida Bar No. 933848
kkaplan@coffeyburlington.com
lperez@coffeyburlington.com
service@coffeyburlington.com
Jared W. Whaley, Esq.
Florida Bar No. 107774
jwhaley@coffeyburlington.com
bdiaz@coffeyburlington.com